**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WAYNE STEWART | : |
| Plaintiff, | : **SECOND** |
| | : **AMENDED COMPLAINT** |
| -vs.- | : |
| | : **15 Civ. 7652 (AT)(JCF)** |
| | : |
| | : |
| CITY OF NEW YORK, DET. R. HENRIQUEZ #2495, | : **ECF** |
| DET. T. FISCHER, #7760 | : |
| | : |
| Defendants. | : |
| | : |

### PRELIMINARY STATEMENT

This is a civil and disability rights action filed by Wayne Stewart ("Mr. Stewart" or "Plaintiff"), a legally disabled inmate of the New York City correctional system, for damages under 42 U.S.C. § 1983, Title II of the Americans' with Disabilities Act, 42 U.S.C. §§ 12101-12132 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.

The allegations of the following Complaint spring from the actions of Defendant City and Detectives taken during the arrest and subsequent detention of Mr. Stewart before his arraignment. Over the course of five days, from late night on July 20, 2014 to July 26, 2014 Detectives denied Mr. Stewart the use of his necessary mobilized wheelchair and the use of his medical

cushion designed to impede the development and exacerbation of pressure ulcers. Detectives also denied Mr. Stewart medical or other assistance in cleaning bodily waste from his person and changing his adult diapers. Further, Defendants repeatedly transported Mr. Stewart to and from area hospitals without securing him in an appropriate and safe manner or arranging for wheelchair-accessible transportation. These repeated deprivations resulted in Mr. Stewart's incredible discomfort, physical pain, injuries, humiliation and emotional suffering. Defendants' actions and deprivations violated the ADA, the Rehabilitation Act, and the due process clause of the Fourteenth Amendment of the United States Constitution.

## JURISDICTION

1.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1334 (a) (3), 1343 (a) (4).  The matters in controversy arise under 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § 12132.

2.   Venue is proper in this district pursuant to 28 U.S.C. § 1391. (b) (1) and (2).

## THE PARTIES

### Plaintiff

3.   Plaintiff Wayne Stewart ("Stewart") at the time of the events for which this action is brought was in the custody of officers of the 25th precinct of the New York City Police Department.

4.   Mr. Stewart is 36 years old and is in a paraplegic state, meaning he is paralyzed in his lower extremities.  He has been paralyzed since 2002.

5.   Mr. Stewart's right leg was amputated in 2013.

6.   Mr. Stewart is wheelchair bound and his motorized wheelchair is his sole source of personal mobility.  He also uses a wheelchair/scooter under certain circumstances.

7.   Mr. Stewart is fitted for a catheter for urine function and cannot use the bathroom or control his bowel or urinary functions.

8.   Mr. Stewart wears adult diapers that must be changed on a regular basis, sometimes with the assistance of others.

9.   Mr. Stewart's disability substantially impairs his quality of life and he must rely on various accommodating devices, equipment, aids and auxiliary services for mobility and to perform other major life activities.

10.  Mr. Stewart's disability substantially impairs his ability to engage in the following major life activities: caring for oneself, performing manual tasks, walking, standing, bending and working.

11.  Mr. Stewart's disability also substantially impairs many of his major bodily functions including the ability to control or regulate his bowels and bladder.

12.  Mr. Stewart's necessary confinement to a wheelchair also leads to pressure or "decubitus" ulcers.  While Mr. Stewart often suffers from ulcers, like any other wheelchair-bound person, his pain and suffering can be exacerbated by neglect of the ulcers or their infection.

13.  Mr. Stewart uses a specialized medical cushion in his wheelchair or in any place he is sitting to prevent the development of new decubitus ulcers and/or the exacerbation of sores already present.

14.  Plaintiff, with or without reasonable accommodations, meets the eligibility requirements for receiving services and participating in programs and activities available to New York City detainees and prisoners.

15.  As described above, Plaintiff is a "qualified individual with disabilities," as that term is defined in the ADA 42 U.S.C. § 12131(2).

**Defendants and State Actors**

16. Defendant City of New York is a public entity.

17.  According to the "Report of the Fiscal 2016 Preliminary Budget and the Fiscal 2015 Preliminary Mayor's Management Report," the New York City Police Department receives funds from the federal government.

18.  Detective Rubin Henriquez is a detective employed by the New York City Police Department.

19.  Detective Thomas Fischer is a detective employed by the New York City Police Department.

### FACTUAL ALLEGATIONS

### A. Facts Relating to Mr. Stewart's Treatment By Defendant Officers and City of New York

20.  Mr. Stewart was arrested by detectives of the New York City Police Department, including Defendants Henriquez and Fischer, on July 20, 2014 late in the evening.

21.  The detectives knew that Mr. Stewart was a paraplegic and wheelchair bound; in fact, they organized Mr. Stewart's apprehension through an informant.    Despite Defendant

detectives' knowledge well in advance that they were taking a wheelchair-bound amputee into custody, they did not arrange for accommodating transportation.

22. At the time of the arrest, Mr. Stewart was in a motor vehicle with two other individuals.

23. Mr. Stewart told Defendant Detectives that he was paralyzed and required his mobility device.

24. Defendant Detectives Henriquez and Fischer dragged Mr. Stewart from the vehicle and handcuffed him.

25. Defendant Detectives Henriquez and Fischer seized certain items from the car at the time of Plaintiff's arrest, including adult diapers.

26. An ambulance transported Mr. Stewart to Jacobi Hospital.

27. Mr. Stewart was at Jacobi Hospital for approximately two hours. Medical practitioners examined his decubitus ulcers and found no signs of sepsis, fever or infection. The medical practitioner prescribed pain medication for the pain from Mr. Stewart's ulcers.

28. Mr. Stewart was taken out of Jacobi Hospital and Defendant Detectives placed him in the back of the unmarked police car once again without any restraint other than a seatbelt. Mr.

Stewart's hands were cuffed and he could not brace or balance himself on the bench seat.

29. Defendant Detectives did not arrange for an ambulance or wheelchair-accessible transportation to safely transport Mr. Stewart to the 25th precinct.

30. Defendant Detectives drove Mr. Stewart to the 25th Precinct.

31. Upon arrival at the 25th Precinct, Defendant Detectives brought out a secretary's chair to the car with wheels on the legs.

32. Mr. Stewart told Defendant Detectives that he needed his motorized wheelchair.

33. Defendant Detectives transferred Mr. Stewart to the wheeled secretary's chair and pushed it into the precinct.

34. Mr. Stewart repeated several times that he needed his wheelchair and cushion to avoid exacerbation of his pressure ulcers.

35. Mr. Stewart was wheeled into a first floor cell and made to transfer himself onto the metal slab within the cell that serves as a chair/bed for inmates from the wheeled secretary chair.

36. Mr. Stewart told the Defendant Detectives that he could not sit on the metal slab because of pressure points and resulting bedsores.

37. Defendant Detectives did not provide him with a mattress, his wheelchair or his cushion for use in his cell.

38. Mr. Stewart suffered great pain and mental anguish while sitting on the metal slab and trying to shift his body weight repeatedly to avoid pressure on his ulcers.

39. Mr. Stewart generally takes Percocet for his pain, but did not have his medication on him at the time of his arrest.

40. At Jacobi he was prescribed Motrin, but the prescription was not filled as he was in police custody and despite his complaints of suffering from pain he was not given anything pain medication during the nineteen (19) hours.

41. Mr. Stewart's diaper was full and extremely smelly during this period of incarceration at the 25th Precinct, causing him humiliation, discomfort and mental anguish.

42. Mr. Stewart repeatedly told the officers that he needed his diaper to be changed, that he was extremely uncomfortable sitting in his own feces and urine and that he was at risk of infection.

43.  Mr. Stewart was especially concerned about infection of his ulcers because he lost his right leg in 2013 due to infection in an ulcer.

44.  Mr. Stewart told Defendant Detectives that he needed his mobilized wheelchair as well as his cushion to avoid pain from the pressure created by the metal slab on his underside.

45.  Mr. Stewart was held at the 25th Precinct without his mobilized wheelchair and/or his cushion for approximately nineteen (19) hours.

46.  Defendant Detectives did not assist Mr. Stewart with the changing of his diaper or see to it that he got assistance for at least nineteen (19) hours.

47.  Mr. Stewart had no way to clean or change himself while in custody during the nineteen (19) hours.

48.  At approximately 11:00am on July 21, 2014, Officer Michael Langella and two other officers went to the residence of Quinndale Smith to interview him because Mr. Stewart had stayed at his home before his arrest.

49.  In the hall outside Mr. Smith's residence was Mr. Stewart's wheelchair/scooter.

50.  The officers loaded the wheelchair/scooter into the trunk of their automobile with the assistance of Mr. Smith. The

officers then drove Mr. Smith to the 25th Precinct in order to interview him.

51.  When they arrived at the 25th Precinct, Lieutenant Brown eventually removed Mr. Stewart's wheelchair/scooter from the trunk of the car, but did not give it to Mr. Stewart.

52.  Late in the evening, Defendant Officers finally called EMTs to the precinct to attend to Mr. Stewart, as he was complaining of abdominal pain and fever.

53.  The EMTs moved Mr. Stewart to the emergency vehicle in a wheeled secretary chair, as Defendant Officers had not provided Mr. Stewart with the wheelchair/scooter.

54.  The nurse at Metropolitan Hospital inquired about the whereabouts of Mr. Stewart's mobility device.

55.  The staff at Metropolitan Hospital cleaned up Mr. Stewart and changed his diaper.

56.  The medical staff at Metropolitan Hospital diagnosed Mr. Stewart with acute cystitis and colitis.

57.  The medical staff at Metropolitan Hospital admitted Mr. Stewart and treated him with intravenous antibiotics, as well as pain medication.

58.  Mr. Stewart remained at Metropolitan Hospital until July 24, 2014.

59.  On July 24, 2014 Mr. Stewart was released from Metropolitan Hospital.

60.  Defendant Detectives did not arrange for an ambulance or wheelchair-accessible transportation to safely transport Mr. Stewart back to the 25th precinct.

61.  Mr. Stewart was once again transported in an unmarked police car back to the 25th Precinct.

62.  Upon arrival at the Precinct, Defendant Detectives placed Mr. Stewart in a wheeled secretary's chair and wheeled him back to the same cell where he had been on July 21, 2014.

63.  Mr. Stewart saw his wheelchair/scooter in the lobby area of the precinct.

64.  Once again, Mr. Stewart asked for his mobility device, but Defendant Detectives would not give the wheelchair/scooter to Mr. Stewart.

65.  Defendant Detectives pushed the wheeled secretary's chair with Mr. Stewart in it into his holding cell.

66. Each time the Defendant Detectives pushed the chair into the cell, Mr. Stewart was left to move his body from the wheeled secretary's chair to the metal slab without assistance.

67. Once Mr. Stewart moved his body onto the metal slab, officers would retrieve the wheeled secretary's chair from the cell.

68. Once again, Mr. Stewart was forced to sit on the metal slab in his cell without any cushioning.

69. Once again, Mr. Stewart was not offered assistance in changing his diaper or addressing his personal hygiene needs while in custody at the 25th Precinct.

70. On information and belief Mr. Stewart was at the 25th Precinct on July 24, 2014 for at least eight (8) hours without a way to change his diaper and without his mobility device or cushion.

71. At one point, Mr. Stewart fell from the metal slab while trying to hoist his body up off the wheeled secretary's chair unaided.

72. Mr. Stewart let Defendant Detectives know that he had hurt himself.

73.   Defendant   Detectives   Fischer,   Henriquez   and   Detective Michael Pistorini argued over whether or not to take Mr. Stewart to the hospital again.

74.   Eventually, Defendant Detectives wheeled Mr. Stewart out to a van in the wheeled secretary's chair.

75.   Once   again,   Defendant   Detectives   did   not   give   Mr.   Stewart his wheelchair/scooter to aid his mobility.

76.   Defendant   Detectives   transported   Mr.   Stewart   to   Harlem Hospital   in   a   vehicle   that   did   not   properly   secure   him   once again.

77.   Mr.   Stewart   was   handcuffed   behind   his   back   and   placed   in   a captain's chair without side arms to hold him in the chair seat.

78.   Defendant   Detectives   did   not   arrange   for   an   ambulance   or wheelchair-accessible   transportation   to   safely   transport   Mr. Stewart.

79.   At   Harlem   Hospital,   Mr.   Stewart   complained   of   pain   in   his arm   from   his   fall   and   other   ailments.   He   was   treated   with medication and discharged.

80.   At some point on July 23, 2014, Mr. Stewart was transported to Bellevue Hospital.

81. To take Mr. Stewart to Bellevue Hospital, Defendant Detectives wheeled Mr. Stewart out to a van in the wheeled secretary's chair.

82. Mr. Stewart was then transferred to a captain's chair within the van, which did not have arms on either side to contain Mr. Stewart.

83. Mr. Stewart's hands were cuffed and he struggled to balance himself within the chair during driving.

84. Defendant Detectives did not arrange for an ambulance or wheelchair-accessible transportation to safely transport Mr. Stewart.

85. Once the van arrived at Bellevue a nurse brought a wheelchair to the side of the van but Mr. Stewart, who was unsecured and could not move himself into the wheelchair, fell to the ground.

86. The nurse screamed in shock and Mr. Stewart was lifted into the wheelchair.

87. At Bellevue Hospital, Mr. Stewart was examined for any injuries as a result of the fall.

89. Defendant Detectives never offered the option of a bedside arraignment to Mr. Stewart.

90.  At some point, Mr. Stewart was taken to his arraignment hearing and was held in the "Tombs."

91.  At the Tombs, Mr. Stewart was examined by Dr. Landis Barnes, who had Mr. Stewart transported to Bellevue Hospital for admission so medical staff there could give him the care he required.   Two of Mr. Stewart's decubitus ulcers were now "weeping."

92.  At Bellevue Hospital both a social worker named Yvette Negbaur and a patient advocate named Maurice Fortune assisted Mr. Stewart with finally getting his wheelchair from the Defendant Detectives.

93.  On August 14, 2014 Mr. Stewart's wheelchair was finally given to him at Bellevue Hospital.

### B.   NYPD's Pattern and Practice of Failing to Accommodate Arrestees or Detainees Who Use Wheelchairs

94.  Upon information and belief, the NYPD does not have official policy or procedures in place for the reasonable accommodations of suspects who are wheelchair-bound.

95.  Upon information and belief, the NYPD has never instituted official policies or procedures for the reasonable accommodation of detainees or arrestees who are wheelchair-bound.

96.  Upon information and belief, the NYPD does not train its officers on the reasonable accommodation of detainees or arrestees who are wheelchair-bound.

97.  The City of New York routinely fails to provide appropriate and accessible vehicles to the NYPD for use when NYPD personnel transport a wheelchair-bound person.

98.  The City of New York also fails to offer adequate training to its NYPD employees to govern situations where a person who uses a wheelchair needs to be transported.

99.  The City of New York does not have a written policy concerning how NYPD personnel are to appropriately accommodate people who use wheelchairs when they need to be transported.

100. The City of New York does not have any wheelchair accessible vans within the fleet of vehicles the NYPD uses to transport arrestees or detainees.

101. Accessible vans for wheelchair users have features such as very wide doors, ramps on a safe slope into the vehicle, barriers on the sides of the ramp to ensure stability, and devices to secure the person inside the van.

102. Publicly available information chronicles numerous incidents of the NYPD's unsafe interactions with people who use wheelchairs.  These incidents demonstrate the City of New York's

pervasive pattern and practice of denying wheelchair-bound arrestees and detainees accommodations and appropriate transport, as well as insufficient training for NYPD personnel.

103. In a 2002 action in the United State District Court for the Eastern District of New York ("EDNY"), Donald D. Davis, a wheelchair user, alleged that officers refused to transport his wheelchair with him at the time of his arrest.

104. In a 2009 SDNY action, William L. Joyner, a wheelchair user, alleged that "officers took [him] out of [his] wheelchair and did not have a wheelchair police van" during arrest.

105. A 2012 article in the New York Observer describes an incident involving Larry Wagner, a Vietnam War veteran and wheelchair user, who was arrested and transported in a police van. According to Mr. Wagener, officers did not allow him to bring his wheelchair to the precinct.

106. In 2012, NYPD officers had difficulty transporting arrestees who used wheelchairs to the precinct from an Occupy Wall Street Disability Caucus protest outside Gracie Mansion. This protest coincided with an anniversary celebrating the Americans with Disabilities Act.

107. On October 1, 2013, NYPD officers arrested Jose Morales, who is wheelchair-bound. They transported him on the floor of

the van after he told the officers that he would need "special transportation due to his paraplegic state." Morales sued on October 28, 2013 for the violations of his rights, well before Plaintiff in the instant matter was arrested.

108. A 2014 New York Times article describes an incident involving Fredrick Brennan a 19-year-old wheelchair user, who was stranded in the snow and developed hypothermia after NYPD officers' indifference to his disability. The article describes both the physical inaccessibility of the NYPD precinct and that Mr. Brennan, "was told the police did not have a van with a lift for the chair."

109. Upon information and belief, the NYPD does not have an official policy and procedure for accommodating arrestees or detainees who use adult diapers or other necessary alternatives to regular bathroom facilities.

110. The City of New York has failed to train NYPD personnel on the reasonable accommodation of wheelchair-bound arrestees and detainees who use adult diapers or other necessary alternatives to regular bathroom facilities.

## STATEMENT OF CLAIMS

### COUNT ONE

### (Violations of Title II of the Americans with Disabilities Act, 42 U.S.C.S § 12132 Against Defendant City of New York)

111.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

112.   Plaintiff is a qualified individual with a disability as defined in the ADA. He is a paraplegic, which substantially limits the major life activity of mobility, and also affects other major life activities including going to the bathroom, performing manual tasks and working.

113.   Plaintiff has a record of having such disability.

114.   As a city detainee, Plaintiff met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant City of New York. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2); 29 U.S.C. § 794.

115. Defendant City of New York discriminated against Plaintiff solely on the basis of his disability by failing to accommodate his disability in denying access to his mobility device and the means with which to clean and change his diapers.

116.   Defendant City of New York is a public entity as that term is defined in 42 U.S.C. § 12131(1)(B).

117.  The  City  of  New  York  and  the  New  York  City  Police Department receive federal financial assistance.

**COUNT TWO**

**(Violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 Against Defendant City of New York)**

118.  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

119.  Plaintiff  is  a  qualified  individual  with  a  disability  as defined  by  the  Rehabilitation  Act.  Plaintiff's  disability substantially  impairs  his  ability  to  engage  in  the  following major  life  activities:  caring  for  oneself,  performing  manual tasks, walking, standing, bending and working.

120. Mr. Stewart's disability also substantially impairs many of his  major  bodily  functions  including  the  ability  to  control  or regulate his digestive system, bowels and bladder.

121.  Plaintiff has a record of having such impairments and is regarded as having such impairments.

122.   As   a   city   detainee,   Plaintiff   met   the   essential eligibility  requirements  for  the  receipt  of  services  or  the participation in programs or activities as provided by Defendant City of New York. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

123.  Defendant discriminated against Plaintiff solely on the basis of his disability by failing to accommodate his disability

in denying access to his mobility device and the means with which to clean and change his diapers.

124.     The City of New York and the New York City Police Department receive federal financial assistance.

## COUNT THREE

### (Violations of Title II of the Americans with Disabilities Act, 42 U.S.C.S § 12132 Against Defendant City of New York)

125.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

126.   Plaintiff is a qualified individual with a disability as defined in the ADA. He is a paraplegic, which substantially limits the major life activity of mobility, and also affects other major life activities including going to the bathroom, performing manual tasks and working.

127.   Plaintiff has a record of having such disability.

128. As a city detainee, Plaintiff met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant City of New York. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2); 29 U.S.C. § 794.

129.   Defendant City of New York discriminated against Plaintiff, a wheelchair-bound detainee, by repeatedly failing to

transport Plaintiff safely and exposing him to danger and injury.

130. Defendant City of New York discriminated against Plaintiff on the basis of his disability in violation of 42 U.S.C. § 12132.

131. Defendant City of New York is a public entity as that term is defined in 42 U.S.C. § 12131(1)(B).

## COUNT FOUR

### (Violation of The Due Process Clause of the Fourteenth Amendment Against Defendants Henriquez and Fischer in Individual Capacities)

132. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-109 as if set forth herein at length.

133. Despite the smell and Plaintiff's repeated pleas, Defendants were deliberately indifferent to Plaintiff's health and safety and refused to arrange for the assistance to Mr. Stewart in the changing of his diapers during his confinement at the 25th precinct in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

## COUNT FIVE

### (Violation of The Due Process Clause of the Fourteenth Amendment Against Defendants Henriquez and Fischer in Individual Capacities)

134. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

135. Despite the smell and Plaintiff's repeated pleas, Defendants perpetuated a condition of confinement that did not allow for the reasonable sanitation and Plaintiff's ability to eliminate and dispose of his bodily waste without unreasonable risk of contamination during his confinement at the 25th precinct in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

## COUNT SIX

**(Violation of The Due Process Clause of the Fourteenth Amendment Against Defendants Henriquez and Fischer in Individual Capacities)**

136. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-109 as if set forth herein at length.

137. Defendants Henriquez and Fischer's refusal to provide Plaintiff with his mobility device and cushion while at the 25th Precinct constitutes deliberate indifference to Plaintiff's serious pain and suffering in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

**COUNT SEVEN**

**(Violation of The Due Process Clause of the Fourteenth Amendment Against Defendants Henriquez and Fischer in Individual Capacities)**

138. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

139. Defendants exhibited deliberate indifference to Plaintiff's safety when transporting him repeatedly without proper accommodations to the 25th Precinct and area hospitals.

140. A reasonable defendant would have realized after the first unsafe transport and Plaintiff's pleas that his actions violated plaintiff's rights.

141. Defendants' decision to repeat their wrongdoing by unsafely transporting Plaintiff demonstrates a complete disregard for Plaintiff's safety and violates the due process clause of the Fourteenth Amendment.

**COUNT EIGHT**

**(Violation of Civil Rights 42 U.S.C. § 1983 against Defendant City of New York)**

142. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

143. Defendant City of New York has no written policy in place concerning how its employees transport people who use

wheelchairs.   In fact, the current NYPD Patrol Guide provides officers with scant guidance regarding how to transport and treat people who use wheelchairs.

144. It was highly predictable that NYPD personnel would encounter and transport people who use wheelchairs in New York City.   Indeed, the Defendant officers knew Plaintiff was wheelchair-bound when they sought to take him in for questioning.

145. It continues to be highly predictable that NYPD personnel will encounter and transport people who use wheelchairs in New York City.   Defendant City of New York knows with certainty that NYPD personnel will continue to encounter and transport people who use wheelchairs.

146. Defendant City of New York has notice of numerous complaints in which NYPD officers allegedly violated the rights of people who use wheelchairs.

147. Defendant City of New York has consequently long been aware that the NYPD's failures would result, and will continue to result, in the deprivation of individual wheelchair users' constitutional and federal rights.

148. Defendant City of New York's deliberate choice to ignore the known problems with NYPD officers providing transport to

people who use wheelchairs, and the City of New York's failure to implement an adequate policy or practice to guide its officers in the NYPD concerning how to transport arrestees who use wheelchairs resulted in the violation of Plaintiff's rights. The NYPD's customs and practices for transporting people who use wheelchairs are discriminatory and dangerous.

149. The City of New York also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duties, despite the NYPD's history of encounters with people who use wheelchairs and the certainty that NYPD personnel would continue to transport people who use wheelchairs in New York City.

150. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to the conduct alleged herein, Defendant City of New York has deprived plaintiff of rights, remedies, privileges, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA and other federal laws.

151. Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful, unconstitutional and discriminatory

conduct, and is entitled to damages, injunctive relief and reasonable attorneys fees and costs in an amount to be determined by the court.

## COUNT NINE

### (Violation of Civil Rights 42 U.S.C. § 1983 against Defendant City of New York)

152. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-110 as if set forth herein at length.

153. Defendant City of New York has no written policy in place concerning how its employees reasonable accommodate detainees or arrestees who necessarily use a diaper or other means of eliminating personal waste. In fact, the current NYPD Patrol Guide provides officers with scant guidance regarding how to accommodate people who must use diapers or catheters.

154. It was highly predictable that NYPD personnel would encounter and detain or arrest people in New York City who necessarily use a diaper or catheter. Indeed, the Defendant officers knew Plaintiff used adult diapers when they arrested him.

155. It continues to be highly predictable that NYPD personnel will detain or arrest people in New York City who necessarily use a diaper or catheter. Defendant City of New York knows with

certainty that NYPD personnel will continue to encounter people who necessarily use a diaper or catheter.

156. Defendant City of New York has notice of numerous complaints in which NYPD officers allegedly violated the rights of people who use adult diapers or catheters.

157. Defendant City of New York has consequently long been aware that the NYPD's failures would result, and will continue to result, in the deprivation of individual constitutional and federal rights.

158. Defendant City of New York's deliberate choice to ignore the known problems with NYPD officers providing reasonable accommodations to people who use diapers or catheters, and the City of New York's failure to implement an adequate policy or practice to guide its officers resulted in the violation of Plaintiff's rights. The NYPD's customs and practices for not allowing for the adequate sanitation and ability to dispose of one's bodily wastes without unreasonably risking contamination are discriminatory and dangerous.

159. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to the conduct alleged herein, Defendant City of New York has deprived plaintiff of rights, remedies, privileges, privileges and immunities guaranteed to every

citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA and other federal laws.

160. Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful, unconstitutional and discriminatory conduct, and is entitled to damages, injunctive relief and reasonable attorneys fees and costs in an amount to be determined by the court.

## DEMAND FOR A JURY TRIAL

Plaintiff Wayne Stewart hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court grant the following relief and enter judgment in his favor:

A. Award such damages to Plaintiff as will fully compensate him for the loss of his rights, as well as for the injury, harm and indignity that he experienced due to Defendants' discriminatory conduct according to proof at trial;

B. Award exemplary and punitive damages to Plaintiff according to proof at trial;

E.    Ordering such other and further relief, including attorney fees and costs, as the Court may deem just and proper.


Dated:      New York, New York
            March 16, 2017


                          **LAW OFFICE OF AMY JANE AGNEW, P.C.**


                          _____
                              Amy Jane Agnew, Esq.
                    43 West 43rd Street, Suite 79
                    New York, New York 10036
                              (973) 600-1724
                              aj@ajagnew.com
                    *Pro Bono Counsel for Plaintiff*